**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SL BEVERAGE LIQUIDATION, LLC, *et al.*,[1] | Case No. 24-11468 (LSS) |
| Debtors. | Jointly Administered |
| | **Obj. Deadline: December 10, 2024 at 4:00 p.m. ET** |
| | **Hearing Date: December 19, 2024 at 10:00 a.m. ET** |

**MOTION OF CAUSA (I) FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)(1)(A) AND (II) TO COMPEL
ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS**

CAUSA, LLC ("CAUSA"), by and through its undersigned counsel, hereby moves (the "Motion") (i) for the allowance and payment of an administrative expense claim pursuant to section 503(b)(1)(A) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and (ii) to compel the Debtor Salt Life, LLC (the "Debtor" or "Salt Life") to promptly assume or reject the executory contracts described herein pursuant to sections 105(a) and 365(d)(2) of the Bankruptcy Code. In support of this Motion, CAUSA respectfully states as follows:

**JURISDICTION**

1.      This Court (as defined below) has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

2.      Pursuant to Local Rule 9013-1(f), CAUSA consents to the entry of a final

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are SL Beverage Liquidation, LLC (was Salt Life Beverage, LLC at the time of the Petition Date), a Delaware limited liability company (8436), Delta Apparel, Inc., a Georgia corporation (8794), SL Liquidation, LLC (was Salt Life, LLC), a Georgia limited liability company (6136), MJS Liquidation, LLC (was M. J. Soffe, LLC), a North Carolina limited liability company (2056), Culver City Clothing Company, a Georgia corporation (4619), DTG2Go, LLC, a Georgia limited liability company (6498), and SL Beverage Management Liquidation, LLC (was Salt Life Beverage Management, LLC), a Delaware limited liability company (7886). The location of the Debtors' headquarters and mailing address is 2750 Premiere Parkway, Suite 100, Duluth, Georgia 30097.

judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory predicate for the relief sought herein is Bankruptcy Code sections 105(a), 365(d)(2), and 503(b)(1)(A).

## **BACKGROUND**

4.      On June 30, 2024 (the "Petition Date"), the above-captioned debtors (the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      Prior to the Petition Date, CAUSA and Salt Life entered into various purchase orders ("POs") by which CAUSA agreed to manufacture and sell clothing to Salt Life with Salt Life's logo and designs printed on them.  Pursuant to the POs and the parties' customary practices, shipment terms were FOB factory; CAUSA would manufacture the purchased clothing in India and make such clothing available to the Debtor to arrange for pick up and delivery to the Debtor on net 30 payment terms.  Due to the customary nature of the goods ordered by Salt Life, the POs often required lead times of several months prior to shipment.

6.      In June 2024, just weeks prior to the Petition Date, Salt Life's president, Jeff Stillwell ("Stillwell"), contacted CAUSA explaining that Salt Life was undergoing a sale process, and he sought assurances that goods would continue to be manufactured for and available to the Debtor so that fall goods would be available for sale by the Debtor.  CAUSA continued to communicate with Stillwell leading up to and during the Debtor's bankruptcy case about payment, the Debtor's intent to continue doing business with CAUSA under a new buyer (who was the stalking horse bidder in this case), and the need for CAUSA to continue to produce

goods for the Debtor pursuant to the POs.  CAUSA ultimately agreed to continue the production

of the goods for the Fall POs (defined below) and accepted additional POs from the Debtor.

7.    As of the Petition Date, CAUSA had received a set of POs with a total purchase

price of $372,666.60 between March 8, 2024 and March 18, 2024 (the "Fall 24 Regular POs")

and a set of POs totaling $200,228.04 on April 10, 2024 (the "Fall 24 Promo Fleece POs," and

together with the Fall 24 Regular POs, the "Fall POs").  Summaries of the Fall POs and some

Fall PO examples are attached hereto as **Exhibit A**.[2]  Post-petition, in August, following the

aforementioned communications with the Debtor, CAUSA authorized production of the Fall 24

Regular POs.  Also in August, the Debtor re-issued the Fall 24 Promo Fleece POs to CAUSA

and CAUSA began production for the products ordered therein.  In addition, prior to and after

the Petition Date, the Debtor received various orders of sample clothing items for the summer of

2025 with a total purchase price of $17,607 (the "Summer Orders").  Further, shortly after the

Petition Date, Salt Life sent CAUSA two additional sets of POs for clothing items for the spring

of 2025 with a total purchase price of $514,883.12 (the "Spring POs").  Summaries of the Spring

POs and Summer Orders and some Spring PO examples are attached hereto **Exhibit B**.[3]

8.    At the beginning of September, CAUSA learned that an auction was held for the

Debtors' assets and that the stalking horse bidder did not win the auction.  Instead, Hilco and

Iconix won the auction.  *See Notice of Filing Proposed Order Authorizing the Sale of the Salt*

*Life Assets* [D.I. 285].  At that point, CAUSA had substantially completed manufacturing the

clothing items for the Fall POs and Summer Orders, which were completed soon after, and began

the manufacturing process for the Spring POs based on the Debtor's indication that it needed

CAUSA to continue to perform under the POs in order for Salt Life's business to continue to

---

[2] Copies of all of the Fall POs are available upon email request to CAUSA's undersigned counsel.

[3] Copies of all of the Spring POs are available upon email request to CAUSA's undersigned counsel.

operate and a sale of Salt Life's business to occur.  The Court entered a sale order approving the sale of the Debtors' assets to Hilco and Iconix on September 16, 2024.  *See* Sale Order, D.I. 348. Following entry of the sale order, CAUSA's counsel reached out to counsel for the Debtors and Iconix, who indicated that they are not interested in taking or paying for the completed goods ordered pursuant to the Fall POs.  At the time of the filing of this Motion, although completed and available, Salt Life has not picked up the clothing items from CAUSA's facilities, paid for the Fall POs, or rejected any of the outstanding POs, each of which is an executory contract. Notwithstanding that Salt Life has not picked up the purchased goods, it was able to market itself for a potential sale based on the post-petition inventory that it had ordered.

9.      Based on the foregoing, CAUSA has an administrative expense claim pursuant to section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code in the amount of $572,894.64 (the "Administrative Claim") for the Fall POs.  CAUSA is not seeking an administrative expense claim for the amounts due under the Spring POs and Summer Orders at this time, but instead seeks to have all of its outstanding POs assumed or rejected by the Debtors.  CAUSA reserves its right to file a general unsecured claim for the amounts owed under the outstanding POs to the extent they are rejected and to seek relief from the automatic stay to the extent necessary (without admitting same) to permit CAUSA to dispose of the goods it made pursuant to the POs on the open market without restriction.

## BASIS FOR RELIEF

### I.      CAUSA's Administrative Expense Claim

10.      Bankruptcy Code Section 507(a) grants priority to administrative expense claims that are allowed under section 503(b).  *See* 11 U.S.C. § 507(a).  Section 503(b) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including –

(1)(A) the actual, necessary costs and expenses of preserving the estate …" 11 U.S.C. § 503(b)(1)(A).  In the Third Circuit, the phrase "actual" and "necessary" costs and expenses of preserving the estate "include[s] costs ordinarily incident to operation of a business, [and] [is] not [ ] limited to costs without which rehabilitation would be impossible."  *Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685, 689-90 (3d Cir. 1999) (citing *Reading Co. v. Brown*, 391 U.S. 471 (1968)).

11.    In order for a claim to qualify for administrative expense priority in the Third Circuit, the expense (1) must arise from a post-petition transaction with the debtor in possession and (2) must be beneficial to the debtor in possession in the operation of the business.  *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 314-315 (3d Cir. 2011) (finding that where covered employees are required to perform work post-petition in order to keep the debtor-in-possession in operation, a benefit to the estate is unquestionably conferred, warranting administrative expense priority to a multiemployer fund's withdrawal liability claim against a debtor attributable to the post-petition period) (quoting *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 532-533 (3d Cir. 1999)); *see also In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 172-73 (3d Cir. 2012) (same); *In re Harnischfeger Indus., Inc.*, 293 B.R. 650, 659 (Bankr. D. Del. 2003) (applying the two-pronged administrative claim test).

**A.  CAUSA's Claim Arises from a Post-Petition Transaction**

12.    Although the Debtor reaffirmed the Fall POs post-petition, the first part of the *Marcal* test does not require a post-petition contract – rather, continued post-petition benefits conferred under a pre-petition contract can qualify.  Thus, "[t]o be eligible for administrative expense priority . . . a claimant's performance of a pre-petition contract, and a debtor's acceptance of that performance, can establish a post-petition transaction."  *Goody's Fam. Clothing, Inc. v. Mountaineer Prop. Co. II, LLC (In re Goody's Fam. Clothing, Inc.)*, 401 B.R.

656, 671 (D. Del. 2009) (holding that where premises are used to preserve a debtor's estate post-petition, section 503(b) creates a mechanism for a landlord to recover stub rent as an administrative expense claim), *aff'd sub nom. In re Goody's Fam. Clothing Inc.*, 610 F.3d 812 (3d Cir. 2010); *see also In re A.H. Robins Co., Inc.*, 68 B.R. 705, 711 (Bankr. E.D. Va. 1986) (holding that even "passive acceptance of benefits from a creditor during the post-petition period . . . converts that creditor's claim for post-petition services into one entitled to an administrative priority"); *Peters v. Pikes Peak Musicians Ass'n*, 462 F.3d 1265 (10th Cir. 2006) (finding post-petition services were performed by musicians under pre-petition collective bargaining agreement where musicians remained ready, willing, and able to play post-petition, even though post-petition scheduled events and practices were cancelled).  Further, goods produced post-petition based on pre-petition orders arise from post-petition transactions with a debtor under section 503(b).  *See In re Bluestem Brands, Inc.*, 2021 WL 3174911, at *5-6 (Bankr. D. Del. July 27, 2021) (allowing administrative expense claim finding that goods delivered postpetition on prepetition contract provided a benefit to the estate).

13.    The Administrative Claim is a post-petition transaction under the standard provided in the *Marcal* test.  First, there is no question that the Fall POs were post-petition obligations, because the Debtor reaffirmed the Fall POs post-petition, and they were for goods that were manufactured for, completed, and made available to Salt Life after the Petition Date. Further, the Debtors continued to derive benefits from the POs post-petition, including but not limited to the ability to market and sell CAUSA products and market its assets on the basis that the purchased goods had already been ordered from CAUSA.  At no point did the Debtors reject the Fall POs or any agreement with CAUSA.  Indeed, the Debtor's president told CAUSA that it needed the purchased goods, and the Debtor submitted additional POs post-petition.  Simply put,

CAUSA's performance of its post-petition obligations under the Fall POs and the Debtor's active and passive acceptance thereof are post-petition transactions which give rise to an administrative claim.

**B.  The Post-Petition Continuation of the Fall POs is Beneficial to the Debtors' Estates**

14.    The Third Circuit has made clear that the important inquiry is whether there was a "benefit to the estate."   While the word "benefit" does not itself appear in the text of § 503(b)(1)(A), the Third Circuit has noted that it functions as "merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary' within the meaning of § 503(b)(1)(A)."  *In re Energy Future Holdings Corp.*, 990 F.3d 728, 742 (3d Cir. 2021) (holding that failed purchaser plausibly alleged that its costs incurred in performing due diligence and its other efforts to consummate a merger benefited the estate) (quoting *Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 443 (5th Cir. 2019)).  The benefit does not have to be substantial in order to qualify as an administrative expense.  *Id.*

15.    Additionally, while the amount to be allowed as an administrative expense claim "must be measured in dollars and cents... the question whether the estate has been benefited cannot be so narrowly confined."  *Energy Future Holdings*, 990 F.3d at 742 (citing *Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992)).  In the § 503(b)(1)(A) context, the concept of "necessary costs" is broader than one of absolute requirement, and "less readily calculable benefits, such as the ability to conduct business as usual," can qualify.  *See id.*

16.    The Debtors and their estates obtained post-petition benefits from the Fall POs. As set forth above, the Fall POs enabled the Debtors to operate as a going concern, with incoming inventory, to consummate a sale of the Debtors' assets.  Without the outstanding POs and the incoming products from such POs, it seems that the stalking horse bidder would have had no interest in purchasing the Debtors' assets at the bid amount it made, if it at all.  Further,

the stalking horse bid set a floor for the higher purchase price made by Iconix and Hilco. *See Energy Future Holdings*, 990 F.3d at 742 (noting that potential beneficial acts that would justify termination fee under section 503(b)(1)(A) include "'promot[ing] more competitive bidding' by 'induc[ing] an initial bid' or 'inducing a bid that otherwise would not have been made and without which bidding would have been limited'" (citation omitted)). Thus, CAUSA's post-petition services were not only crucial to the Debtors' abilities to operate post-petition as a going concern, they were also important to achieving the ultimate sale of the Debtors' assets. The importance and necessity of the Fall POs to the preservation of Debtors is also evident by Salt Life's president's correspondence and calls requesting that CAUSA provide the purchased products despite the bankruptcy filing. Thus, despite the fact that Salt Life ultimately did not pick up the ordered goods, CAUSA provided a necessary benefit to the preservation of the Debtors' estates. Courts have likewise found that the final product or service need not be received or used by a debtor for the creditor to have provided a benefit to the debtor's estate that arises to an administrative claim. *See, e.g.*, *Peters*, 462 F.3d at 1273 (finding post-petition availability of musicians to perform under pre-petition agreement despite post-petition scheduled events and practices being cancelled and ultimate liquidation of debtor was "not only beneficial but necessary to the preservation of the Orchestra's business"); *Kimzey v. Premium Casing Equip., LLC*, 2018 WL 1321971, at *7 (W.D. La. Mar. 14, 2018) (allowing administrative rent at rate provided in lease even though the debtor did not use the equipment, finding intangible benefits because the debtor chose to retain the equipment while its assets were marketed for sale); *In re River Oaks Furniture, Inc.*, 269 B.R. 733, 737 (N.D. Miss. 2001) (finding that the furniture wholesale debtor received a benefit from placing an order with a furniture component dealer, Lifestyle Enterprises, Inc. ("Lifestyle"), even though the debtor never took possession of

the ordered furniture components, because the order enhanced the debtor's ability to operate as a going concern as the component dealer supplied the means necessary for the debtor to secure a later cancelled order for custom-made furniture components).  This is why the mantra that "the goods must have been delivered" is an inaccurate statement of the law, and the reason why CAUSA has filed this Motion.  There is no bright line for a court to use to determine whether a benefit was conferred, but in this case a benefit was conferred by CAUSA enabling a sale of a going concern.

17.    This case has many similar facts to those in *In re River Oaks Furniture, Inc.* 269 B.R. 733.  In *River Oaks Furniture*, the United States District Court for the Northern District of Mississippi, Eastern Division, affirmed a bankruptcy court's decision granting a furniture component dealer, Lifestyle, an administrative claim under Bankruptcy Code section 503(b)(1) for specialized furniture components that the furniture wholesaler debtor, River Oaks, had ordered.  *Id.* at 734 & 737.  The debtor ordered the components to secure an order from a customer named Heilig Meyers.  *See id.* at 735 & 737.  Heilig Meyers ultimately cancelled the order from the debtor.  *Id.* at 735 & 737.  In turn, the debtor did not pay Lifestyle for the ordered furniture components and advised Lifestyle that it no longer would take possession of the ordered goods, which Lifestyle had sitting in storage.  *See id.* at 735 & 737.  In affirming the bankruptcy court's decision, the Mississippi District Court held that Lifestyle was entitled to an award of an administrative claim.  *Id.* at 734 & 737.  The court found that the debtor benefited from the Lifestyle furniture component order and the order "enhanced River Oaks ability to function as a going concern."  *Id.* at 737.  The court reasoned that "Lifestyle supplied Red Oaks with the means necessary for River Oaks to secure an order from Heilig Meyers for custom-made furniture components.  That Heilig Meyers later cancelled the order with River Oaks does

not negate the fact that River Oaks received a benefit from the placing of the order." *Id.* Here, like in *River Oaks Furniture,* the Debtor advised CAUSA at the last minute that it would not take delivery of products that it purchased and which CAUSA had specifically manufactured for the Debtor. Indeed, the Debtor never even tried to reject the POs, each an executory contract, for reasons unknown to CAUSA. CAUSA is holding the products in storage at its warehouse. Further, CAUSA likewise supplied the Debtor with the means necessary to enhance its ability to function as a going concern and achieve a sale of its assets to the stalking horse bidder or otherwise. Moreover, similar to the cancelled order by Heilig Meyers in *River Oaks Furniture*, the fact that the sale to the stalking horse bidder did not go through as planned does not alter the fact that the Debtors' received a benefit from CAUSA's services under the Fall POs and that the orders enhanced the Debtors' abilities to operate as a going concern and find a buyer.

18.     CAUSA should also be awarded an administrative expense claim for the amount of the Fall POs because it was induced by the Debtor to supply the ordered goods to the Debtor. "When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a [pre-petition] contract that has not been rejected, the purposes of [§ 503(b)(1)] plainly require that their claims be afforded priority." *In re Goody's Fam. Clothing*, 401 B.R. at 672 (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)). As set forth herein, the Debtor's president induced CAUSA immediately before and after the bankruptcy filing to proceed with the manufacturing process for the Fall POs and accept new POs by offering CAUSA the prospects of payment and an imminent sale with a well-capitalized buyer.

19.     Based on the foregoing, CAUSA should be awarded an administrative claim for the amounts of the Fall POs. However, if the Court does not grant an administrative expense claim, CAUSA requests that the Court enter an order allowing it to sell the goods that were

produced for the Debtor for the POs and Summer Orders or otherwise provide CAUSA relief

from the stay to commence litigation against the Debtors and others, if necessary, to seek such

relief.

**II.      The Court Should Compel Assumption or Rejection of the POs**

20.      Section 365(d)(2) of the Bankruptcy Code provides in relevant part that:

> In a case under Chapter . . . 11 . . . of this title, the trustee may assume
> or reject an executory contract or unexpired lease of . . . personal
> property of the debtor at any time before the confirmation of a plan but
> the court, on request of any party to such contract or lease, may order
> the trustee to determine within a specified period of time whether to
> assume or reject such contract or lease.

21.      What constitutes "reasonable time" within which to affirm or reject a lease under

11 U.S.C. § 365(d)(2) is left to the Bankruptcy Court's discretion in light of the circumstances of

a particular case.  *In re Attorneys Office Mgmt., Inc.*, 29 B.R. 96, 98 (Bankr. C.D. Cal. 1983)

(citing *In re Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir.1982)); *see also In re

Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003).

22.      Among the factors that the courts have used to determine what may constitute

"reasonable time" for the purposes of section 365(d)(2) of the Bankruptcy Code are the

following:  (a) the nature of the interests at stake, (b) the balance of harm to the parties, (c) the

safeguards afforded to the parties, (d) the damage third parties may suffer beyond the

compensation available under the Bankruptcy Code, (e) the debtor's failure or ability to satisfy

post-petition obligations, (f) the purposes of chapter 11, (g) the importance of the contract in

question to the debtor's reorganization, and (h) whether the action to be taken is so in derogation

of Congress' scheme as to be said to be arbitrary.  *See Adelphia*, 291 B.R. at 292–94.

23.      Approximately five months have passed since the Petition Date, and the Debtors

continue to receive the benefit of having the outstanding POs and the Summer Orders without

making any payment or providing any consideration to CAUSA.  If the Debtors do not assume or reject the POs and Summer Orders, CAUSA will have grounds to file for additional administrative expense claims and are also left in limbo on whether to continue to manufacture the goods in the Spring POs and whether and how to dispose of the goods in the Fall POs and Summer Orders.  Indeed, as a matter of law, unlike the Debtors who could unilaterally not perform their obligations to pay by rejecting the POs, CAUSA remains obligated to perform unless and until the POs are rejected.  At the same time, given that Salt Life has sold off its assets and no longer appears to be operating as a going concern, there is no harm to the Debtors by assuming or rejecting the POs at this point.  Accordingly, there is a substantial basis for requiring the Debtors to make an immediate determination to either assume or reject the Fall and Spring POs and Summer Orders.

24.    Before the Debtors may assume an executory contract or unexpired lease, 11 U.S.C. § 365(b)(1) requires that the Debtors cure existing defaults and provide adequate performance under the POs.  If the Debtors seek to assume the POs, the Debtors will be required to cure all pre-petition and post-petition arrears, along with attorneys' fees, costs and expenses. If the POs are to be rejected, the same should be done forthwith in order to avoid damages accruing to CAUSA from its obligations to produce goods and administrative expenses accruing.

25.    Overall, the Debtors have failed to provide any consideration to CAUSA and yet continue to receive the benefit of the POs and Summer Orders.  CAUSA believes that this Court should compel the Debtors to assume or reject the POs and Summer Orders immediately or within such requisite amount of time as the Court deems proper.

## CONCLUSION

WHEREFORE, CAUSA respectfully requests that the Court enter an order, substantially in the form attached hereto (i) granting CAUSA an allowed administrative expense claim in the amount of $572,894.64 and authorizing the payment thereof pursuant to section 503(b)(1)(A) of the Bankruptcy Code, (ii) compelling the Debtors to promptly assume or reject the POs immediately or within such requisite amount of time that the Court deems proper, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: November 26, 2024
      Wilmington, Delaware

**BAYARD, P.A.**

*/s/ Steven D. Adler*
Neil B. Glassman (DE Bar No. 2087)
Steven D. Adler (DE Bar No. 6257)
Ashly L. Riches (DE Bar No. 7256)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
E-mail: nglassman@bayardlaw.com
      sadler@bayardlaw.com
      ariches@bayardlaw.com

*Counsel to CAUSA, LLC*